J-S52021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
OSCAR MARTINEZ :
:
Appellant : No. 885 EDA 2020

Appeal from the PCRA Order Entered March 4, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008142-2010

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
OSCAR MARTINEZ :
:
Appellant : No. 886 EDA 2020

Appeal from the PCRA Order Entered March 4, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008143-2010

BEFORE: PANELLA, P.J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.: **FILED: MARCH 22, 2021**

Oscar Martinez (Appellant) appeals from dismissal of his petition

brought under the Post Conviction Relief Act (PCRA)[1] in the Court of Common

Pleas of Philadelphia. Appellant raises certain complaints sounding in alleged

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

ineffective assistance of trial and appellate counsel, as detailed herein. Appointed counsel has filed a letter of no merit and motion to withdraw, consistent with **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). We affirm, and grant counsel's application to withdraw.

The trial court summarized the facts as follows when this matter was on direct appeal:

> The Commonwealth began its case by submitting a written stipulation concerning police and medical records and then called its first witness, the complainant at [docket CP-51-CR-0008143, J.O.], age fourteen at the time of trial, who testified as follows:
>
> [J.O.] identified [Appellant] as her grandmother's husband whom she had known longer than she could remember and with whom she had a grandfather-granddaughter relationship. She would see him often at her grandmother's house and her home in Philadelphia where she lived with her stepfather, mother and sister. Her mother worked at a store down the block from their home and her stepfather worked in security on the first floor of their building. There were often times when [Appellant] would come visit her when she was alone while her parents were at work and her sister would cook and take dinner to them when they were on their . . . breaks. On one such occasion, three years prior to trial when [J.O.] was eleven, [Appellant] said to her that they were going to play a game. Thinking he meant a board game, she went into her room to get one and he followed her, closed the door and said they were going to play a different type of game. He put her on the floor, took off her clothes and engaged her in intercourse. After that, her back started to hurt and she experienced a certain type of odor coming from her vagina. She told her mother about those complaints[, and her mother] took [J.O.] to a regular doctor who conducted a urine test and said it was just a urinary tract infection. About a year or so later, after her family had moved to New Jersey and [J.O.] was still experiencing the odor, [J.O.'s] mother took her and her sister, [S.O.], to a hospital in New Jersey where [J.O.] was given another urine test and an OB/GYN exam

and was told she had a "[STI] called trich" (a [Sexually Transmitted Infection], Trichomoniasis, often called "trich"), for which she was given antibiotics. [J.O.] then told the doctor, who told [J.O.'s] mother, about the incident with [Appellant].

On cross-examination, [J.O.] said she didn't tell anyone about the incident because she was scared and didn't know if anyone would believe her because she was only 11 and [Appellant] was a grown man. After cross-examination, the Commonwealth entered into evidence by stipulation the medical records [of J.O.] from "Atlantic Care," the hospital to which she referred, and then called [J.O.'s] sister, the complainant at [docket CP-51-CR-0008142, S.O.], age eighteen at [the] time of trial.

[S.O.] also identified [Appellant] as her grandmother's husband whom she had known longer than she could remember and with whom she had a grandfather-granddaughter relationship. Whenever her parents were working[,] she and her sister would take turns bringing them dinner, which would take about twenty-five to thirty minutes, and [Appellant] would come visit them about twice a week. One time, when she was about eleven or twelve and her sister took her stepfather dinner, [Appellant] told [S.O.] to go into her bedroom, walked in behind her, closed the door, told her not to say anything, took off her clothes and his pants and had intercourse with her. When asked whether this happened more than once, [S.O.] said [Appellant] would come over at least twice a week and it would happen every time, continuing from the time she was eleven, the last time when she was a freshman in high school in 2008-2009. It happened twice while she and [Appellant] were watching television in her grandmother's bedroom at her [grandmother's] and [Appellant's] house, where she and her sister also had bedrooms, always when they were alone. In May of 2010, [S.O.] went to the hospital in New Jersey with her mother and her sister due to her having back and cramping pains and told the doctor there about the incidents with [Appellant] and also informed her mother.

On cross-examination, defense counsel had [S.O.] agree that they found nothing wrong with her at the hospital,[3] and, in Family Court, [S.O.] testified that [Appellant] had intercourse with her three times a week from when she was eleven [until] when she was fifteen, which came to 627 times, but, previous to that had told the police that it only happened twelve times, which [S.O.] attributed to increasing memories over time, and to her perceived

differences between the exact questions that the police and the prosecutor had asked her; counsel also noted that, while [Appellant] was a much larger person than [S.O.] and [S.O.] described him as having laid right on top of her with his arms on the floor, he did not crush her. After redirect and re-cross, the prosecutor entered the following into evidence by stipulation:

> Cindy Delgado would testify [t]hat she's a pediatrician who works at a Child Abuse Research Education and Service Institute, also known as CARES . . . [and t]hat on June 24th of 2010, she examined [S.O.] for a diagnosis and treatment of any residual findings of sexual abuse[.]
>
> [T]hat [S.O.] arrived at CARES with her mother, father and sister, [J.O.]
>
> Prior to the examination, Dr. Delgado spoke with [S.O., who] told the doctor that she never had consensual sex and does not have a boyfriend. She also never had vaginal discharge, odor or bleeding or a history of accidental genital trauma. [S.O.] further stated that she was almost 12 years old when [Appellant] began abusing her. [S.O.] said that she thought it was not right when he started touching her[.] [S.O.] said [Appellant] touched her at her grandmother's house and that he took off [her] clothes, laid [her] on the ground, climbed on top of [her], spread [her] legs and put his penis in [her] vagina. When he was finished, [S.O.] went into the bathroom and peed, it hurt and blood was in the toilet. [Appellant], she said, told her she could not tell anybody because nobody would believe her. [S.O.] told Dr. Delgado that it happened a couple of times between the ages of 11 and 15. [S.O.] also said that two years ago it happened at her stepfather's [home].
>
> *   *   *

The prosecutor then called [Victims'] mother, [C.S.], who confirmed everything in which her daughters described her being involved, including the visit to the hospital in Atlantic City [in May

- 4 -

2010] where a doctor there told her that [J.O.] had an infection that was transmitted by sex, for which they treated her and, after some follow-up care, was completely cleared up. On cross-examination, [defense] counsel took great pains pointing out that, at the hospital, she was given discharge instructions which said to call in three days for lab results but she had said that she and her daughters received the test results that same day. [C.S.] replied that she did not recall those instructions, reiterated her recollection of getting the results at the hospital, and pointed out that they (probably meaning only [J.O.]) also were prescribed their antibiotics that same day. The prosecutor moved the state's exhibits into evidence, C-1 being the Atlantic City hospital records for [J.O.], C-2 the [Dr.] Delgado stipulation and C-3[,] a medical report that went with the latter, and rested.

The defense called [M.S.P.], who characterized herself as [Appellant's] lover, was sexually active with him from 2006 up until 2009, would frequently get tested for STDs, including trich, the last time having been June 30, 2010, and never tested positive. Defense counsel submitted by stipulation[:] "That there were three character witnesses [who would testify] that [Appellant] is a person of good character of peacefulness, honesty, law-abiding." . . . The defense then moved into evidence D-2, the hospital records which the prosecutor had moved in as C-1, but which included the discharge instructions about which he had questioned [Victims'] mother containing the recommendation of a follow-up call that were not included with the latter, to which there was no objection, and D-3, which counsel characterized as [several learned treatises on trich and the follow-up tests associated with diagnosis of trich, which the court admitted over the Commonwealth's objection].

The defense then rested, and, after announcing its verdict, the court explained[:] The existence or nonexistence of the sexually transmitted disease is not a dispositive factor in this case. The primary factor as in all sexual assault cases has to do with the [c]ourt's analysis of credibility of the Commonwealth witnesses which [the court] found not to be wanting. The verdict would have been the same even if there [were] no scientific evidence.

(Trial Ct. Op., 7/29/16, at 2-6) (internal citations and footnote omitted). Following a bench trial, the trial court convicted Appellant of two counts each of rape and corruption of minors.[2]

There was no timely direct appeal, but Appellant filed an initial PCRA petition successfully seeking reinstatement *nunc pro tunc* of his appellate rights. This Court heard his appeal and affirmed his conviction on May 24, 2017, and Appellant's petition for allowance of appeal with our Supreme Court was denied on December 20, 2017.[3] He filed the present petition under the PCRA, which we treat as an initial petition, on July 3, 2018.[4] On March 4, 2020, the trial court dismissed his petition without a hearing, having complied with the procedures outlined in Pa.R.Crim.P. 907. On March 11, 2020, Appellant filed distinct notices of appeal in each matter captioned here; this Court consolidated these appeals *sua sponte* on June 4, 2020.

Appellant's appointed PCRA counsel (PCRA Counsel) indicated in his filing responding to the trial court's order per Pa.R.A.P. 1925(b) that he intended to file a letter of no merit, but that Appellant wished to raise the following issues on appeal:

---

[2] 18 Pa.C.S. §§ 3121(a)(1); 6301(a)(1)(i), respectively.

[3] ***See Commonwealth v. Martinez***, 1735 EDA 2016 (Pa. Super. 2017); ***Commonwealth v. Martinez***, 258 EAL 2017 (Pa. Dec. 20, 2017).

[4] Because Appellant filed his petition within a year of his judgment of sentence becoming final, it is timely; ***see*** 42 Pa.C.S. § 9545(b)(1) and (3).

> 1. [The trial court] committed an abuse of discretion by denying Appellant an evidentiary hearing and post-conviction collateral relief on his claim asserting that trial counsel was ineffective for failing to call Carmen Pacheco and Javier Negron as fact witnesses at trial.
>
> 2. [The trial court] committed an abuse of discretion by denying Appellant an evidentiary hearing and post-conviction collateral relief on his claim alleging that trial counsel was ineffective for failing to call character witnesses during Appellant's trial.

Matters Complained of on Appeal, 6/24/20, at 1 (unpaginated); *see also* *Finley* Letter, 7/14/20, at 6, 9. Appellant has not filed a response to counsel's *Finley* Letter with this Court.

"In PCRA proceedings, an appellate court's scope of review is limited by the PCRA's parameters; since most PCRA appeals involve mixed questions of fact and law, the standard of review is whether the PCRA court's findings are supported by the record and free of legal error." *Commonwealth v. Pitts*, 981 A.2d 875, 878 (Pa. 2009) (citation omitted). "It is well-settled that a PCRA court's credibility determinations are binding upon an appellate court so long as they are supported by the record." *Commonwealth v. Robinson*, 82 A.3d 998, 1013 (Pa. 2013) (citation omitted). However, this Court reviews the PCRA court's legal conclusions *de novo*. *Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. Super. 2014) (citation omitted).

PCRA petitioners have a general rule-based right to the assistance of counsel for their first PCRA petition. Pa.R.Crim.P. 904(C); *accord* *Commonwealth v. Robinson*, 970 A.2d 455, 457 (Pa. Super. 2009) (*en*

*banc*) ("a criminal defendant has a right to representation of counsel for purposes of litigating a first PCRA petition through the entire appellate process[ ]"). "The indigent petitioner's right to counsel must be honored regardless of the merits of his underlying claims, even where those claims were previously addressed on direct appeal, so long as the petition in question is his first." *Commonwealth v. Powell*, 781 A.2d 1017, 1019 (Pa. Super. 2001) (citation omitted). "Moreover, once counsel is appointed, he [or she] must take affirmative steps to discharge his [or her] duties." *Id.*

Our system of collateral review allows for appointed counsel, caught between their duty to the appointed client and their duty to abstain from pursuing frivolous claims, to untie this Gordian knot by adhering to the dictates of *Turner* and *Finley*, thereby providing the courts with an analysis of an appellant's claims and any other issues apparent from the record, and with the assurance that counsel's comprehensive review of the matter (including review of the complete record and of trial preparation, trial, and the direct appeal) has unearthed no further issues. *See Commonwealth v. Doty*, 48 A.3d 451, 454 (Pa. Super. 2012) (a *Turner/Finley* letter must outline the nature and extent of counsel's diligent review of the case, list the issues upon which petitioner seeks review, and explain why those issues lack merit).

We find that PCRA Counsel has complied with the requirements of *Turner/Finley*. PCRA Counsel notes that he reviewed the issues raised in Appellant's filings and the entire record. *Finley* Letter at 4. PCRA Counsel

also analyzes the issues upon which Appellant seeks review, explaining their lack of merit with reference to the relevant facts and applicable law. *Id.* at 6-9, 9-16. We agree with PCRA Counsel's analysis, as detailed *infra*.

### 1. PROPOSED FACT WITNESSES

Appellant asserted that trial counsel was ineffective for failing to call as fact witnesses Carmen Pacheco and Javier Negron. *Finley* Letter at 6. The proposed testimony would allegedly have established that Appellant's stepson, Negron, never saw Appellant alone with the victims, and would have testified as to his understanding of Appellant's work schedule (which would supposedly show that the victims' claims, being incompatible with that schedule, must be cast into doubt). *Id.* at 6-7. Appellant's spouse, Pacheco, would allegedly have testified that Appellant was "always" with her or at work, and that she simply does not believe Appellant to have committed these crimes. *Id.* at 6.

The trial court analyzes this claim as follows: "According to [Appellant,] he was prejudiced because the two witnesses would have testified to [his] good character, his work schedule, and the fact that he was not with or around the victims during the alleged times of abuse." Trial Ct. Op., 6/30/20, at 4. However, the trial court concludes that Appellant could not have been prejudiced by the absence of the proposed testimony, because the proposed witnesses, Appellant's spouse and stepson, would have been impeached for bias. *Id.* at 5. Further, the proposed testimony, to the extent that its purpose was to establish the impossibility of the alleged crimes because of different recollections of Appellant's schedule, could not have effectively countered the

testimony put forth by the Commonwealth, as the testimony of the child victims understandably did not include exact dates and times; thus, the proposed testimony that Appellant "was not at the scene of the crime on many occasions is benign, inexact, and carries no evidentiary weight." *Id.* at 6.

"To establish trial counsel's ineffectiveness, a petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for the course of action or inaction chosen; and (3) counsel's action or inaction prejudiced the petitioner." *Commonwealth v. Freeland*, 106 A.3d 768, 775 (Pa. Super. 2014) (*citing Strickland v. Washington*, 466 U.S. 668 (1984); *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987)). Petitioners must show by a preponderance that their conviction or sentence resulted from ineffective assistance that, in the case's particular circumstances, so undermined the truth-finding function that no reliable adjudication of guilt or innocence was possible. *Id.* We begin by presuming that counsel is effective, and that not every error by counsel can or will result in a violation of a petitioner's Sixth Amendment right to counsel. *Commonwealth v. Gribble*, 863 A.2d 455, 472 (Pa. 2004).

Where an ineffectiveness claim hinges on the proposed testimony of witnesses who went uncalled at trial, petitioners must establish that the proposed witnesses were available and willing to testify, that counsel knew or should have known of the proposed witnesses, and that the absence of the proposed testimony so prejudiced the petitioner that they were denied a fair trial. *Commonwealth v. Reid*, 99 A.3d 427, 438 (Pa. 2014).

- 10 -

Here, the trial court and PCRA Counsel agree that the proposed testimony would not have altered the outcome of Appellant's trial. Trial Ct. Op. at 6; *Finley* Letter at 8.[5] We agree with these independent analyses, as the proposed testimony lacks specifics, and even if it was specific enough to carry some value, the complaints of the child witnesses are not so easily capable of rebuttal because they did not testify to a series of specific dates and times upon which the abuse occurred (of course, such fuzziness is to be expected from witnesses recounting childhood events). Further, we note that at trial, a stipulation was entered that three character witnesses would testify to Appellant's peaceful, honest, and law-abiding reputation. N.T. Trial, 5/11/12, at 103. To the extent that Appellant's spouse would testify that she does not believe him guilty, this testimony potentially strays into character, rather than fact, testimony. Thus Appellant could not have been prejudiced by its absence as the Commonwealth and trial court both accepted the character stipulation at face value. *See id.* Appellant has not established that he is entitled to a hearing on this claim; thus, it was properly dismissed.

2.     FAILURE TO CALL CHARACTER WITNESSES

PCRA Counsel notes that Appellant's claim as to ineffectiveness for failure to call character witnesses is inadequately pled, as Appellant failed to provide essential data, certificates, or affidavits, by which the alleged value of

_____

[5] PCRA Counsel (who, we note, was appointed for this appeal but was not Appellant's counsel during PCRA proceedings below) also notes that Appellant failed to plead that Pacheco and Negron were available and willing to testify at trial. *Finley* Letter at 7.

the proposed testimony might be weighed. *Finley* Letter at 9. PCRA Counsel also notes the stipulation to character testimony we reference supra, and concludes that the proposed testimony would, at best, have been merely cumulative. *Id.* at 10. We are constrained to agree, as we cannot see how cumulative character testimony would have altered Appellant's situation (and it is also unclear whether Appellant understands what proposed testimony supported the stipulation at trial; thus Appellant may be basing this claim on proposed testimony that was actually included in the stipulation). This claim fails.

### 3. REMAINING CLAIMS

PCRA Counsel also analyzes two claims that were not included in amended filings below but that were raised at some point prior by Appellant. *Finley* Letter at 11-16. Appellant apparently argued that trial counsel should not have stipulated to the testimony of Dr Cindy Delgado, as she was not properly certified as an expert and her report contains inadmissible hearsay. *Id.* at 11-12. Appellant also argued that trial counsel was ineffective for advising him to proceed via bench trial rather than asserting his right to a trial by jury. *Id.* at 12. These issues were not raised in Appellant's amended petitions below. *Id.*

PCRA Counsel also observes that the trial court specified that its guilty verdict was predicated on credibility determinations and would have been the same without any scientific evidence. N.T. Trial, 5/11/12, at 104. The trial

court made this statement as it announced the verdict, and not in response to Appellant's after-the-fact arguments; thus, it carries especial weight.

Further, Appellant was given a thorough on-the-record colloquy as to his right to a trial by jury. *Finley* Letter at 15; N.T. Trial, 5/11/12, at 6-13. PCRA petitioners "may not obtain post-conviction relief by claiming that [they] lied" during waiver colloquies. *Commonwealth v. Bishop*, 645 A.2d 274, 277 (Pa. Super. 1994) (citations omitted). This claim necessarily fails.

Order affirmed. Counsel permitted to withdraw.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/22/21</u>